IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

EDDIE GUSBY                                                                                    PLAINTIFF

VS.                                         CASE NO. 07-CV-1090

CONAGRA POULTRY COMPANY
and PILGRIM'S PRIDE, INCORPORATED                                       DEFENDANTS

### MEMORANDUM OPINION

Before the Court is Defendants' refiled Motion for Summary Judgment. (Doc. No. 16). The Plaintiff has responded. (Doc. No. 21). The Defendants have filed a reply to Plaintiff's response. (Doc. No. 24). The matter is ripe for consideration.

### BACKGROUND

Eddie Gusby is African-American. In 1979, he began working for the Defendant ConAgra Poultry Company at its chicken processing plant in El Dorado, Arkansas. From 1979 to 1993, Gusby worked in production. In 1993, Gusby successfully bid on and accepted a maintenance position in the plant's rendering department. On or about November 24, 2003, Defendant Pilgrim's Pride purchased ConAgra Poultry, along with the El Dorado processing plant. After the acquisition, Gusby continued to work at the plant. He is currently employed by Pilgrim's Pride as a maintenance man in the plant's rendering department.

During their respective periods of ownership, both ConAgra and Pilgrim's Pride maintained anti-discrimination policies at the plant. Each company's policy prohibited intimidation, harassment and hostile acts against employees. Each policy provided a mechanism

for reporting discrimination and/or harassment complaints.  Each company conducted anti-harassment and discrimination training sessions for its employees. Gusby knew of each company's reporting procedure as well as their confidential 1-800 hotline for reporting any work related problems.

Gusby belongs to the United Food and Commercial Workers Union Local 2008, the Union at the plant.  As a Union member, Gusby could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of his employment, including any racial discrimination and/or harassment.  The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute.  If a resolution could not be reached after the third step, the employee could take the complaint to binding arbitration.  Gusby was aware of the Union's grievance procedure.

In January 1993, Gusby successfully bid on and accepted a maintenance position in the rendering department.  After transferring to maintenance, Jerry Hunter, Gusby's Caucasian supervisor, told him about classes he could take that would help him advance within the maintenance department.  Hunter also told Gusby that ConAgra would pay for these classes. Between 1993 and 1995, Gubsy took electrical and welding classes at the local vo-tech school. Thereafter, in 1995, Gusby was promoted to the level of AAA mechanic.  In 1996, he was promoted to the level of a maintenance tech–the highest level of maintenance employee.  Gusby is currently employed as a maintenance tech in the rendering department.  In this position, he is responsible for keeping the various machines within the department running.

Gusby works maintenance on the evening shift from 3:00 p.m. until 11:00 p.m.   He works with Johnny Gill, an African-American.  Gill and Gusby are the only two maintenance

employees who regularly work the evening shift. Kenny Jackson, an African-American, is their direct supervisor. Ron Cross, a Caucasian, and George Holly, an African-American, work maintenance on the day shift. Randy Beaver is the day shift maintenance supervisor. Gusby has little contact with Cross, Holly or Beaver in that they are gone or just leaving when he arrives for work. However, if somebody has to stay and work overtime, Ron Cross will work the evening shift with Gusby and Gill. Gusby and Gill are replaced at 11:00 p.m. by the night shift. Billy Cook, an African-American, and Rodney Henry, an African-American, work this shift.

Gusby has been supervised by several individuals since transferring to the rendering department. Gusby was first supervised by Bill Devault and Jerry Hunter, both Caucasians. Devault was supervisor of the entire rendering department and Hunter was the maintenance supervisor. In 2000, Walter Cribb, a Caucasian, and Kenny Jackson, an African-American became Gusby's supervisors. Cribb was the rendering department supervisor and Jackson was the maintenance supervisor on the evening shift where Gusby worked. Randy Beaver, a Caucasian, was also a maintenance supervisor in rendering. However, Beaver worked the day shift. Therefore, Gusby has very little contact with him. Gubsy has no complaints – racial or otherwise – regarding his treatment by Devault, Jackson or Beaver. However, he does complain about his treatment at the hands of Jerry Hunter and Walter Cribb.

First, Gusby claims that in 1993, when he bid on the maintenance job in rendering, he was told by another employee that Hunter said he wasn't going to hire any "N's" in maintenance. This was the only time during his tenure at the plant that a Caucasian employee ever directed the "N" word or any other racial slur towards Gusby. When Hunter heard this rumor, he called Gusby into his office. Hunter told Gusby that he did not make the statement. Thereafter, Gubsy

was awarded the maintenance job and Hunter was his supervisor.

Gusby claims that after he got the maintenance job, Hunter "bogged him down on jobs." Gusby also claims that he once was told by Buck Gathwright, another maintenance employee, that he and Jerry Hunter went to the river and shot at a target they called "Eddie." Gusby admits that Hunter never told him that he was shooting at a target named "Eddie." Gusby never went to management or the Union and complained about these incidents.

In 2000, Walter Cribb replaced Bill Devault as the rendering department's supervisor. Gusby had little contact with Cribb because Cribb worked the day shift. When Gusby arrived at work, Cribb would already be gone for the day.

Gusby claims that Cribb never treated him or his fellow employees like maintenance men. Rather, he was "negative, negative, negative" to everybody and never told anyone that they did a good job. Gubsy never complained to management or the Union about Cribb's bad attitude.

Gusby also claims that in 2002 Cribb assigned everyone in the maintenance department addition  jobs. Gusby states that in January 2002, while he was on vacation, Cribb told his fellow maintenance men, Ron Cross, George Holly, Johnny Gill and Billy Cook, that they had a choice to either lay off one maintenance man or start doing the work of three employees moved from their production jobs in rendering. Cribb told the maintenance men that this was a business decision made to save money within the rendering department.

Thereafter, the maintenance men in rendering started doing production work along with their maintenance duties. These production duties included turning on the blood pump, raking feathers in the feather truck, rolling a tarp over the feathers, loading the meal and fat trucks and washing down the concrete slabs. All maintenance employees, whether they were African-

American or Caucasian, were required to perform these new duties. Gusby, however, claims that he had to perform more production work than Ron Cross, the Caucasian maintenance man on days. He bases this claim on the fact that the day shift was busier and had more employees than the evening shift. However, Gusby does not make this same claim in regard to George Holly, the African-American maintenance man who worked with Cross on the day shift.

Gusby never complained to management or the Union about the additional duties that he and the other maintenance workers in rendering were required to preform. However, in 2004, Johnny Gill and George Holly went to Michael Gooch, the plant's human resources director, and complained about having to do the additional work and not getting additional pay. Gill reported to Gusby that Gooch told them that he would get back to them on the issue. Gusby does not know if Gooch ever did.

The rendering department is a stand alone facility that is separate from the main plant. The department has its own bathrooms and own break room. Gusby used the rendering department's bathrooms the majority of the time. He claims that the bathrooms in the main plant and the rendering department had racial graffiti written on the walls. Gusby admits that the graffiti never referred to him personally or threatened him physically. He admits that it did not affect his ability to do his job. Gusby also admits that the bathrooms were painted by the Defendants.

Gusby never had any profanity directed towards him by any Caucasian supervisors at the plant. He also never witnessed any nooses at the plant.

Gusby filed two Union grievances in his twenty-five plus years at the plant. The first was filed in the 1980's and was in regard to being paid holiday pay for one day. After filing the

grievance, Gusby was paid for the day in question. The second grievance was filed in the 1990's, or maybe 2000. It concerned overtime pay. After filing the grievance, Gusby decided to drop it. Neither grievance contained any language alleging race discrimination, racial harassment or a racially hostile work environment.

On December 22, 2003, Gusby, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride. In the Class Action Complaint, Gusby alleged that he had been subjected to racial discrimination at the El Dorado plant. He claimed that the discrimination was in the form of disparate treatment, failure to promote, retaliation and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993.

On November 21, 2005, the Defendants moved for summary judgment on all of Gusby's claims. In his response, Gusby stated that he was not maintaining a failure to promote claim, a disparate treatment claim or a retaliation claim against the Defendants. Therefore, on March 28, 2006, the Court granted summary judgment as to Gusby's claims for disparate treatment, retaliation and failure to promote. Summary judgment was denied as to Gusby's hostile work environment claim on the grounds that merits-based discovery had not begun. The Court ruled that the motion was premature. It also ruled that it could be refiled at a later date.

On May 15, 2007, the Court denied the Class Action Plaintiffs' Motion for Class Certification. Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers. The parties also agreed that no additional discovery was needed and that the Defendants could refile their previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Gusby filed his individual Complaint against the Defendants.

On November 6, 2007, Gusby amended his Complaint. In his Amended Complaint, Gusby alleges that the Defendants discriminated against him because of his race in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107. Specifically, Gusby claims that he was subjected to a hostile work environment. The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

## DISCUSSION

In his Amended Complaint, Gusby alleges that he was subjected to a hostile work environment when he was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls at the plant and witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner. He claims that this discrimination was in violation of 42 U.S.C. § 1981 and the Arkansas Civl Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.

In employment discrimination cases under 42 U.S.C. § 1981 and the ACRA, the courts apply the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim); *Crone v. United Parcel Serv., Inc.,* 302 F.3d 942, 945 (8th Cir. 2002) (applying *McDonnell Douglas* to ACRA claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of

discrimination.  If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination.  If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination.  The Court will review each of Gusby's claims in light of the above burden shifting framework.

Gusby claims that he has been subjected to a hostile work environment at the plant.  In order to establish a racially hostile work environment claim, an employee must show that: 1) he was a member of a protected group; 2) he was subjected to unwelcome race-based harassment; 3) the harassment was because of his membership in the protected group; and 4) the harassment affected a term, condition, or privilege of his employment.  *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003).  Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment.  *Elmahdi,* 339 F.3d. at 652.  The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim."  *Id.* (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)).  Merely feeling offended, however, does not sufficiently affect the conditions of employment to support a claim.  *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).  In determining whether sufficient evidence of a hostile work environment claims has been presented, courts consider all the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Elmahdi,* 339 F.3d. at 652-53.  To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory

9

intimidation, ridicule and insult.  *Elmahdi,* 339 F.3d. at 653.

### Abusive Language at the Plant

Gusby claims that he was subjected to a hostile work environment by the Defendants when he was subjected to abusive language at the plant.  There is no doubt that Gusby is a member of a protected group – African American.  Thus, he can establish the first element of his *prima facie* case of hostile work environment.  However, the Defendants contend that Gusby can not show the other elements of his *prima facie* case – that he was subjected to unwelcome race-based harassment, that the alleged harassment was because of his membership in the protected group and that it affected a term, condition or privilege of his employment.

In support of this claim, Gusby claims that the "N" word was directed at him one time during his twenty-five plus years at the plant.  He states that in 1993, he was told by another employee that Jerry Hunter, the maintenance supervisor in rendering, said he wasn't going to hire any "N's" in maintenance.  Hunter allegedly made this statement after Gusby bid on a maintenance job in rendering.  After hearing the rumor, Hunter talked to Gusby and denied making the statement.  Thereafter, Gusby was awarded the maintenance position in rendering.

One racial slur in a twenty-five plus year period is not severe or pervasive enough to create a hostile work environment.  *Woodland v. Joseph T. Ryerson & Sons, Inc.,* 302 F.3d 839, 844 (8th Cir. 2002).  While offensive, such a comment would not be viewed by a reasonable person as hostile.  *See Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 893 (8th Cir. 2005).  Such offhand comments and isolated incidents will not amount to a discriminatory change in the terms or conditions of employment.  *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir. 1998).  It does not constitute a "steady barrage of opprobrious racial comment."  *Elmahdi*

10

339 F.3d at 653 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981)). Thus, the incident of which Gusby complains is not sufficient to support his claim of a hostile work environment.

Gusby also claims that he was told by Buck Gathwright, another maintenance employee, that he and Jerry Hunter went to the river and shot at a target they called "Eddie." Gusby states that he felt like the target was in reference to him. Gusby never complained to management or the Union about Gathwright's comment.

Although Gathwright's remark to Gusby could be construed as physically threatening and has no place in the work environment, it was not severe or pervasive enough to constitute a hostile work environment. The comment was made by a single coworker on one occasion. Such an isolated incident is not enough to be a discriminatory change in the terms or conditions of Gusby's employment. *Wallin,* 153 F.3d at 688. Also, Gusby never complained about Gathwright's comment. Therefore, he can not show that the Defendants knew or should have known of the alleged harassment by Gusby's coworker and failed to take proper action. *See Palesch v. Mo. Comm'n on Human Rights,* 233 F.3d 560, 566-67 (8th Cir. 2000). Thus, the comment of which Gusby complains is insufficient to establish a cause of action for a hostile work environment.

Next, Gusby claims that Walter Cribb, his Caucasian supervisor in the rendering department, harassed him by never telling him that he did a good job and by being "negative, negative, negative." Gusby admits that Cribb acted this way to everyone in the maintenance department which included Caucasians Ron Cross and Randy Beaver.

While Cribb's negative attitude was unpleasant, being unpleasant does not affect a term

11

or condition of one's employment. *Elmahdi,* 339 F.3d at 654. Cribb acted negatively toward all the maintenance employees in rendering. It did not matter whether they were African-American or Caucasian. There is no evidence that Cribb's bad attitude was motivated by race. *Id.* Thus, Cribb's negative attitude is not sufficient to support Gusby's claim of a hostile work environment.

Finally, Gusby claims that he was subjected to profanity at the plant. However, he now admits that no one ever directed any profanity towards him at the plant.

The discrimination laws are not a general civility code. Thus, the abusive language of which Gusby complains is not what a reasonable person would consider harassment. It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of his employment. Thus, Gusby has failed to establish a *prima facie* case of hostile work environment in connection with the alleged abusive language at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

### Racial Graffiti in the Bathroom

Next, Gusby claims that the presence of racial graffiti on the bathroom walls at the plant created a hostile work environment for him. However, most of the time Gusby used the bathroom in the rendering department, not in the main plant. He never complained to anyone at the plant about the presence of the graffiti. Gusby admits that the bathrooms were painted by the Defendants. He also admits that the presence of the graffiti did not affect his ability to do his job.

In this instance, the graffiti was not specifically directed at Gusby. It did not physically threaten him. It did not affect his ability to work. It was painted over by the Defendants. It is

apparent that the presence of graffiti on the walls in the plant's bathroom was not sufficiently severe or pervasive enough to affect the terms and conditions of Gusby's employment. *See Woodland,* 302 F.3d at 843-44.  Thus, Gusby has failed to establish a *prima facie* case of a hostile work environment in connection with the presence of graffiti in the bathroom.  Accordingly, the Court finds that this claim must fail as a matter of law.

### African-American Employees treated Disrespectfully

Gusby claims that he was subjected to a hostile work environment when he witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner.  Gusby claims that this disrespect was evidenced by profane and demeaning language used toward African-American employees at the plant.  However, the only evidence Gusby offers of profane or demeaning language being used at the plant involves the statements allegedly made by Jerry Hunter and Buck Gathwright.  These are not severe or pervasive enough to have affected a term or condition of one's employment.  *See Bradley v. Widnall,* 232 F.3d 626, 631-32 (8th Cir. 2000).  Thus, Gusby has failed to establish his *prima facie* case of hostile work environment in this regard.  Accordingly, the Court finds that this claim must fail as a matter of law.

Finally, Gusby claims that he was subjected to a hostile work environment because Jerry Hunter "bogged him down on jobs", Walter Cribb assigned him production work along with his maintenance duties and he did more production work than Ron Cross, the Caucasian maintenance man on days, because the day shift was busier and they had additional help.

A hostile work environment is created by verbal or physical harassment directed at an employee and based upon his membership in a protected class.  This harassment must be

13

sufficiently severe or pervasive to affect the terms or conditions of one's employment.  Here, Gusby is not alleging that he was subjected to verbal or physical harassment.  Rather, he is alleging acts of disparate treatment at the hands of the Defendants.  While these alleged acts may have resulted in a frustrating work situation for Gusby, they did not create a work environment permeated with discriminatory intimidation, ridicule or insult.  Thus, there is insufficient evidence to support a claim of a hostile work environment in this regard.  Accordingly, the Court finds that this claim must fail as a matter of law.

## CONCLUSION

For the reasons discussed herein above, the Court finds that Defendants' Motion for Summary Judgment should be and hereby is **granted**.  A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this  30th day of September, 2008.

    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge